No. 2289.
Second Circuit Appeal.

---

CHARLES S. WILKINSON, v. DUBACH MILL CO., INC.

---

(May 9. 1925, Opinion and Decree.)
(June 23, 1925, Rehearing refused.)
(October 6, 1925, Writ of Certiorari to Supreme Court Refused.)

---

*(Syllabus by the Editor.)*

1. **Louisiana Digest—Appeal—Par. 499.**
Under Art. 890 of the Code of Practice, as amended by Act No. 103 of 1908, an answer to an appeal filed before argument on the first day of the regular session of the Court is timely.

2. **Louisiana Digest—Master and Servant—Par. 159, 159 (a).**
Where injured employee has stiff knee, stiff ankle, his foot drawn in, the bones are twisted and displaced, and there is partial paralysis of his entire left side, he is entitled to recover under Section 8, Subsection 1 (b) of Act 20 of 1914, the Employers' Liability Act, for permanent total disability.

3. **Louisiana Digest—Master and Servant—Par. 160 (a).**
If the condition of injured employee is due to hysteria which was dormant before the accident, it is evident that the fall and shock of the accident augmented and caused that condition to manifest itself, so that injured employee's condition, after all, was brought on by the accident.

**4. Louisiana Digest—Master and Servant— Par. 160 (k).**

Where in a suit for compensation under Employers' Liability Act No. 20 of 1914 plaintiff requested that the judgment be in part to his attorney for his fees, the court will give judgment as requested, if fees are reasonable.

ON APPLICATION FOR REHEARING

**5. Louisiana Digest—Master and Servant— Par. 154.**

The jurisprudence of the state is to give a liberal construction in favor of the employee. Therefore, the total loss of the use of a leg is not considered equivalent to the amputation thereof under Section 8, Subsection 1 (d), but where the leg remains a painful nuisance and obstruction to activities necessary to work, the injured employee can recover for permanent total disability to do work of any reasonable character under Employers' Liability Act No. 20 of 1914, Section 8, Subsection 1 (b).

Appeal from Judicial District Court of Louisiana, Parish of Lincoln, Hon. S. L. Digby, Judge.

This is a suit under Employers' Liability Act No. 20 of 1914.

There was judgment for plaintiff and defendant appealed.

Judgment amended and affirmed.

T. S. Price, of Ruston, attorney for plaintiff, appellee.

Dhu Thompson, of Ruston, attorney for defendant, appellant.

ODOM. This is a suit under the Workmen's Compensation Act. The defendant company owns and operates a mill at Dubach, Louisiana. Plaintiff alleges that he was employed by defendant company as a trucker at a weekly wage of $11.70. That his duty was to truck lumber, cross-ties etc., from the saw along a platform, and that another employee, engaged in similar work, allowed a cross-tie to fall from his truck against plaintiff, knocking him off the platform to the ground about twenty feet below, that his left hip was dislocated, his left side was bruised, his left foot was broken, and his left ankle dislocated. He alleges that he is totally, permanently disabled to do work of a reasonable character, and that his left leg is paralysed from the knee down and that his sight was affected by his injuries.

Defendant answered admitting that plaintiff was employed as alleged and that while so employed sustained what it terms a slight injury to the right leg. All other allegations of fact are denied, except that it is admitted that defendant paid plaintiff $147.42. It is especially alleged that plaintiff has entirely recovered from the said injuries.

There was judgment for plaintiff, ordering the defendant to pay him 60% of his wages, or $7.02 per week during a period of disability, not to exceed 300 weeks, with credit for twenty-one weekly payments already made, the judgment being based upon the finding of fact that plaintiff sustained injuries which caused total temporary disability. From this judgment defendant appealed.

Plaintiff answered the appeal asking that the judgment be amended so as to allow plaintiff 60% of his wages for 400 weeks upon the theory that his injuries caused permanent, total disability to do work of a reasonable character. Defendant objected to the filing of this answer because too late.

OPINION.

ON OBJECTION TO AMENDMENT.

Court convened at Monroe, where this case was returnable for argument, in regular session on Monday, April 13th, 1925. This case was placed on the calendar to be argued that day. Before argument counsel for plaintiff, appellee, offered to file an answer to the appeal, asking that the judgment appealed from be amended by allow-

ing plaintiff 60% of his wages for 400 weeks instead of for 300 weeks and by fixing the fees of plaintiff's attorney at one-third of the amount recovered. Appellant objected to the filing on the ground that it came too late.

Under article 890 of the Code of Practice, as it stood originally, the appellee, in order to have the judgment reversed in any part was required to file his answer to the appeal at least three days before the day fixed for argument; but under that article of the Code as amended by Act 103 of 1908, page 161,

"such answer to appeal shall be allowed filed before argument within the first three days of the actual sittings of any regular session of said courts of appeal."

Appellee presented his answer before argument on the first day of the regular session of the court, which was timely under the amendment to the Code noted above.

## ON THE MERITS.

Defendant is a corporation engaged in the manufacture of lumber. Plaintiff is a white man between 30 and 40 years old. He had farmed all his life until the summer of 1923 when he was employed by defendant company as a trucker. It seems that lumber is taken from the cut-off saw on trucks along a platform about twenty-feet above the ground. It was plaintiff's business to truck the lumber from the cut-off saw to the end of the platform. They were sawing hardwood and were putting out a great many cross-ties. On the morning of August 2, 1923, about 9 o'clock, while plaintiff was so engaged, he was returning from the end of the "deck", as he calls it, going back towards the saw, when he met a colored man who had three cross-ties on a truck, two of them lying flat on the truck and the other one lying on top of the two. In some way the cross-tie which was on top fell against plaintiff's right side, knocking him off the platform to the ground, a distance of about twenty feet. Just what part of the body hit the ground first does not appear, but the fall rendered him helpless and unconscious, and, according to his testimony, he did not regain consciousness until the following day about 11 or 12 o'clock—more than twenty four hours.

He was picked up from the ground where he fell by two other employees of the mill and carried first to the office of Doctor Smith, the company's physician, who made a casual examination of him and found no bones broken, dislocations or wounds, except what he termed "a slight injury to the right leg or foot." This injury to the right leg and foot is what plaintiff sustained when the cross-tie fell against him and knocked him off the platform".

Plaintiff was then carried to his home where he remained for about five weeks. He says he was in bed for about four weeks of that time and that no physician attended him during the time and on that point he is corroborated by one or two witnesses but is contradicted by Doctor Joe Smith, the company's physician, who says that he paid a number of visits to him during that time.

Plaintiff evidently suffered a great deal during the time. He says he did and some of the witnesses say he gave evidences of intense pain. He complained of his left hip and leg. He finally got able to leave his house and was seen on the streets of Dubach, the town where the mill is located. Doctor Joe Smith says he saw him a number of times but does not recall that he ever saw him without crutches. About six or seven weeks after the accident he went fishing on two occasions but he says he had to stay where they put him and that is not disputed.

He finally made a trip to Ruston and consulted attorneys who sent him to Doctor

White for an examination. Doctor White does not state the result of his examination but sent the patient to Shreveport where he went under the treatment of Doctor Caldwell in September or October, 1923. Doctor Caldwell examined him in consultation with doctors Crain and Joe Smith and says that he found plaintiff's condition to be as follows:

"At that time I saw him in consultation with Dr. Crane and Dr. Smith, first complaining of the paralysis and drawn condition of the foot. A professional diagnosis of pressure on the sciatic nerve was made at that time and then was followed by a manipulation under anesthetic at the North Louisiana Sanitarium and the foot was put in plaster of paris in the correct position. Following this the plaster was removed and daily treatments begun at the office, consisting of heat in the form of high frequency electric baking and massage over the entire leg and lumbar region on the left side. This was continued for a period of several weeks. At first the progress was very satisfactory in that the patient began to say that he had more sensation in the leg, some sensation of tingling and burning, and then he had an acute attack of tonsilitis, after which improvement seemed to cease, although the treatment was continued for several weeks longer. About this time I called into consultation Dr. J. D. Yound of Shreveport, who concurred in the diagnosis on there being possible pressure on the sciatic nerve but entertained at that time a strong possibility of hysteria."

He says that Doctor Moise, a specialist, removed plaintiff's tonsils, and finally, in February, 1924, some six months after the accident they put plaintiff's foot in plaster paris again. He was finally sent home, and he says he cut the plaster off with his knife.

Doctor Caldwell did not see the patient again until the Saturday before the case was tried on September 3, 1921. On that date he found the patient's knee bent "about twenty-five degrees," and of the foot,

he said: "The technical phrase would be *equino varus*, which simply means the club-footed position." He said that both the foot and the knee were rigid, and he was asked if he could straighten the foot and knee by pressure of his hands, and he said: "Yes, you can with an electric current reacting on the muscles. The muscles all respond and all of those deformities are overcome immediately, even without an anæsthetic. With my hands I can't; it hurts him."

Doctor S. L. White, of Ruston, who originally sent plaintiff to Doctor Caldwell, in Shreveport, during the fall of 1923, examined him on Monday before the trial on September 3, 1924, and of his condition at that time he said: "He seemed to have a paralysis involving his left leg and foot." "His knee was stiff. He resisted any movement to straighten the leg." That his foot was "bent in and he was attempting to walk on the outer side of his foot." That his "left knee and left ankle were stiff." That the left leg is partially paralysed. That he made tests with pins and got no response, and made other tests which convinced him that the patient is partially paralysed on the left side. He says he is not able to do manual labor, and that his condition seems to be permanent.

Doctor W. S. Harrell, also of Ruston, made a superficial examination of the patient before the time of the trial and says: "He appeared to have paralysis of the left side complete and spastic in the lower limb, incomplete in the arm. Contractions of the muscles and tendons caused some deformity of the ankle which was drawn in and rigid." And he further states that the paralysis seemed more or less complete in the entire lower limb.

Doctor Harper, of Ruston, testified that there was a deformity of the foot as shown by the ex-ray picture.

More than once during the progress of the trial the plaintiff was caused to bare his foot and leg so that the judge and others might see that his leg and ankle were bent and rigid.

As has been stated above, the crosstie which knocked plaintiff off the platform struck him on the right side and caused slight injury to the right hip and foot. There seems to have been no permanent injury to that side. The injury of which plaintiff now complains is to his left side, including his hip, his knee and his foot. It was evidently the fall which caused this injury.

At the time of the trial and during practically all the time after plaintiff left his bed he could walk only on crutches. Of his condition at the time of the trial, he said he still suffered; that he could not move his left leg except with the assistance of his hands; that it was with difficulty that he was able to raise his left arm to his head, and that he was not able to work and had not worked since the day of the accident. And his testimony on these points is not disputed. The physicians who examined him and who saw him during the trial say that he was on that date unable to do manual labor of any kind.

We think the testimony clearly shows that plaintiff is totally disabled to do any work of a reasonable character.

On the question of his recovery, Doctor White says his condition appears to be permanent. Doctor Joe Smith says his leg could be braced and then be as good as a wooden leg. Doctor Young says the man is in no condition to work now and that some cases of this kind recover and some do not. Doctor Featherstone says it is possible that the conditions may never be removed and that as long as his mind remains in its present condition he will grow worse, and he says: "It is probable that it will get all right." Doctor Harper says that if nothing is done for the man his condition is permanent. Doctor Caldwell said, in speaking of his condition: "Doubtless in the hands of neurologists it could be treated with some chance of recovery. I don't know the exact possibility in that connection."

Our conclusion is that plaintiff is permanently disabled. He has a stiff knee, a stiff ankle, his foot is drawn in, the bones in his foot are twisted and displaced, and there is partial paralysis of his entire left side. Some of the physicians say that with proper treatment he may recover. The record shows that he has been treated by an eminent neurologist, Doctor Young of Shreveport, and that he was treated for about five months in Shreveport by Doctor Caldwell, a specialist of orthopedic surgery with training in Columbia College of Physicians and Surgeons; in New York City Hospital; training Presbyterian Hospital, New York City; Fracture Hospital in France, two years; did orthopedic work in Atlanta, Ga.; was associated with Doctors Hoke and Hodgson, and one year in the charge of the Shriner's Hospital in Shreveport, and yet the patient's condition has grown worse instead of better. He has had the benefit of the best talent and training in this section. Then what hope is there for him? True, it is possible that if he could be placed with Mayo Brothers or in the Johns-Hopkins Hospital in Baltimore and remain long enough he might recover; and let it be said that he would. But treatment at those places is entirely out of his reach. Who is to pay the bills? We must consider him in his natural environment. It is not what could be done for him under the most favorable circumstances but what will probably be done for him in his present financial condition.

We find that plaintiff is now totally disabled to do work of any reasonable character and that there is a possibility that with the best treatment and care he would improve and possibly recover, but that there is no probability that he will be able to get such treatment. Therefore there is no probability that he will ever recover. Under such conditions we hold that plaintiff is permanently disabled.

See Brooks vs. Peerless Oil Co., 146 La. 383, 83 South. 663.

The defense to the action is that plaintiff is a malinger who makes no effort to procure or perform work of any kind.

Plaintiff is an uneducated man who can neither read nor write. He earns, or did earn a living by manual labor. He farmed until he was employed by the defendant company to truck lumber at $1.95 per day. We don't know, of course, whether he wants to work or not, but we can think of no work that he could do even if he were anxious to work. Some of the witnesses testify that a man with one wooden leg can do manual labor, even work about sawmills; but plaintiff is not a one-legged man. He has two legs, one of which is bent and stiff and in his way. He is unable to get about except on crutches, and as long as this leg is attached to his body he will have to continue to use crutches. Some of the physicians say that plaintiff's condition is due to hysteria and one or two say that it may be due to that. Doctor Caldwell, for instance, says that the drawn and rigid condition of the leg and foot is a "hysterical contraction." That theory does not appeal to us in this case. Doctor White says that plaintiff's condition may be hysterical. He does not say that it is, but he says that such conditions are not found often in men of plaintiff's type. He was asked:

"You find those conditions in what type of people?"

And he answered:

"The hysterical in the higher walks of life."

But suppose it be granted that plaintiff's condition is purely hysterical, or the doctors say it is, that is no defense under the facts of this case for the reason that, according to those doctors, the hysteria was probably brought on by the accident. Doctor Caldwell and others say that hysteria is a condition of the mind which may be entirely dormant and that the fall, the shock resulting therefrom, may have "set it off," brought it on.

Doctor Caldwell says: "The accident itself would not produce the hysteria by itself. I presume, on the other hand, that had he not had the accident he would not have any hysteria manifestations in that leg. It might have been elsewhere in connection with something else entirely."

Doctor Featherstone says hysteria is a heritable condition and that shock might develop it.

Doctor White says the accident might be an exciting cause of the hysterical condition and that a mental shock might bring it on, and he was asked:

"What are the other causes that would bring on a hysterical condition?"

And he said:

"A fall, trauma, mental shock."

If the plaintiff is in fact of a hysterical type, which we doubt, that condition was dormant, and if it be conceded that his condition now is due to his hysteria it is very evident that the fall and the shock, mental and physical, resulting therefrom, augmented and caused that condition to

manifest itself; so that his disabilities, after all, were brought on by the accident, and the defendant is liable.

See Behan vs. John B. Honor Co., 143 La. 348, 78 South. 589.

We are asked to hold that plaintiff is only entitled to recover the amount allowed in case of the amputation of a member, on the theory that the loss of the use of a member is equivalent to the amputation of the member, as provided in Act 43 of 1922.

That theory has no place here for the reason that plaintiff has lost more than his leg. His hip is still rigid and his whole side, including his arm, is partially paralyzed.

We are asked to amend the judgment so as to fix the fees of the attorney of the plaintiff at one-third of the net amount recovered. Plaintiff testified that he agreed to pay his attorney one-third of the net amount which he might recover and he has asked that the judgment be amended so as to allow that, and we can see no reason why it should not be done.

We find that the plaintiff in this case is totally and permanently disabled to do work of any reasonable character.

For the reasons assigned, it is therefore ordered, adjudged and decreed that the judgment appealed from be amended so as to read as follows:

It is therefore ordered, adjudged and decreed that the Dubach Mill Company, Incorporated, pay to the plaintiff, Charlie S. Wilkinson, compensation at the rate of seven and two-hundredths ($7.02) dollars per week during the period of his disability, not, however, beyond four hundred weeks, commencing on August 2, 1923, with five per cent per annum interest on each installment from the date due, the first installment having become due August 9, 1923, and each subsequent installment becoming due at intervals of one week from that date. Subject, however, to a credit for twenty-one weekly installments already paid by defendant to plaintiff. It is further ordered, adjudged and decreed that the fees of the attorney representing the plaintiff in this case be fixed at one-third of the net amount recovered under this judgment. All costs to be paid by defendant.

---

ON APPLICATION FOR REHEARING

CARVER, J. In his brief for rehearing, defendant's able counsel insists that the burden was on plaintiff to prove his case; that the testimony does not show total or permanent disability but temporary and partial disability; and, further, that the applicable clause of the Compensation Act (Section 8 of Act No. 20 of 1914, as amended by Act No. 43 of 1922) is not any of the three disability clauses but that part of Subsection (d) of Section 8, providing that the total permanent loss of the use of a member shall be equivalent to the amputation of the member, and that therefore the award should be for only 175 weeks as for the loss of a leg.

He cites:

Piske vs. Brooklyn Cooperage Co., 143 La. 455, 78 South. 734.

Haddad vs. Commercial M. Truck Co., 150 La. 327, 90 South. 666.

The cited cases have little application in our opinion. They merely decide that the burden is on plaintiff to show that the injury was received in an accident arising out of and in the course of his employment.

The proof in this case unquestionably shows that plaintiff's injuries did so arise.

In the Piske case the accident occurred at a place where plaintiff's employment did not require him to be.

In the Haddad case the court found as a fact that the injury was produced by cancer of the liver.

As to the totality of the injury in this case, the evidence fully satisfied us that the plaintiff at the time of the trial was totally disabled. This question was fully discussed in our original opinion and we see no reason to add anything to what was said therein.

If the plaintiff is totally disabled, then it is clear that either Subsection (a) or Subsection (b) of Section 8 of the act may be held to apply, according as the disability is temporary or permanent.

If by reason of the fact that there is a total loss of the use of the leg, the case might also fall under the above quoted provision from Subsection (d). If so, the situation would be that two clauses of the act cover the case at bar. If then we should apply the clause giving the smaller compensation, this would be adopting a liberal construction in favor of the employer. But the jurisprudence is that a construction liberal to the employe should be adopted.

Jones vs. Powell Lumber Co., 156 La. 767, 101 South. 135.

Besides, the proof shows not merely a loss of the use of the leg; it shows also that the leg remains as a painful nuisance and obstruction to activities necessary for work of a reasonable character.

If our opinion that the disability is permanent shall be disproved by the event, defendant can obtain relief after one year from the time the judgment becomes operative by exercising the right to demand review accorded it by Section 20 of the Compensation Act.

The judgment is not for 400 weeks but only for so much a week during disability, not to exceed 400 weeks.

Should we determine at this time, on the basis of the opinion of some of the doctors, that plaintiff was only temporarily disabled, then should the event prove that we were mistaken, the result would be that we would have denied him 100 weeks' compensation, to which the final result would show he was entitled.

Rehearing refused.