Mathew Johnson, employed by Joseph Tregle as a "general utility" man, the duties of which included the driving of a motor truck owned by defendant and operated in connection with the latter's business, alleges that on November 30, 1940, while so employed and acting within the scope of his employment, he sustained an injury for the consequences of which he is entitled to compensation under our workmen's compensation statute (Act 20 of 1914, as amended) for 65 per centum of his weekly wages of $11, during the period of his disability, not, however, to exceed 400 weeks. Judgment is prayed for accordingly.
For answer, defendant admits plaintiff's employment at wages of $11 per week, as alleged, but denies that plaintiff sustained an accident and injuries as a result of the duties of his employment. He further avers that he received no information or notice of the alleged accident, though admitting that he knew that plaintiff was confined at his home and, subsequently, at the Charity Hospital as a result of illness, the nature of which was unknown to him.
Defendant also asserts that he paid plaintiff various amounts aggregating the sum of $30, for which, it is admitted by plaintiff, defendant is entitled to credit in the event the right of compensation be decreed.
The district court, for written reasons assigned, rendered judgment dismissing plaintiff's suit. Plaintiff has prosecuted this appeal.
In his written reasons for judgment dismissing plaintiff's suit, our learned brother below concluded that the occurrence of the accident was too highly improbable and that, if it did happen, it was improbable that the injuries suffered by plaintiff were a result thereof.
We do not deem it necessary to review in extensive detail the testimony of each witness contained in the record. It is our appreciation that the following is a fair synopsis of the evidence:
On the evening of November 30, 1940, as a part of the duties of his employment, plaintiff was ordered by his employer to call at the residence of one of defendant's customers and to there service merchandise. He drove defendant's truck to the place he was instructed to go, performed his prescribed duties and, while he was returning to his employer's establishment, the motor of the truck became overheated from the lack of water in its radiator. No service stations being available in that neighborhood, plaintiff drove to the nearby residence of his aunt and obtained a bucket of water, which he emptied into the radiator. In so doing, the motor, which he had allowed to run idle, stopped. The self-starter being unusable, he obtained the motor crank and, as he was cranking the motor truck, the crank handle reversed, or "kicked back", causing the hand handle of the crank to strike him violently on his penis. The violence and the effect of the blow was such as to cause him to collapse, and, after the pain had been somewhat relieved, he returned to his employer's establishment and reported the accident to the defendant, the latter dismissing it as a trivial occurrence. It is further shown that plaintiff remained at defendant's establishment and performed his duties, though experiencing continued pain and suffering, and that, when he returned to his home that night, he immediately complained to his wife about the occurrence. It is also shown that plaintiff remained in bed, applying self-medication, but that, on December 5th, his genital organs had become so inflamed and painful that he was transferred to the emergency ward of the Charity Hospital.
The hospital records reflect that at the time that plaintiff was admitted he was in an irrational condition and that the history of his injuries was to the effect that he had received "a blow on his penis three days previous, while cranking a Ford truck". His genital organs were extensively swollen and inflamed and in a gangrenous condition. The diagnosis of the hospital physicians showed that plaintiff was suffering from "urinary extravasation, a stricture of the urethra (urinary channel), generalized lues, broncho pneumonia, with gangrene and considerable sloughing of the penis and *Page 757 
scrotum." This condition was described in the hospital report as "post-traumatic". It may be noted at this time that "urinary extravasation" is medically defined to mean a condition due either to trauma, where there is a rupture, or tear, or to inflammation, as a result of which the urine, or a part thereof, leaves the channel provided by nature and burrows into the tissues, thereby producing a chemical reaction, with following extensive infection.
Plaintiff remained in the hospital under treatment for a period of fifty-two days. It is shown that his was considered one of the rarest cases ever experienced by the attending physicians, and that, because of his desperate condition, he was given six separate blood transfusions. In the process of healing, it is shown that a stricture was formed in the urinary channel, preventing normal elimination, as a result of which a perforation had to be made in his lower abdominal wall and a tube inserted therein for urinary discharges. As a result of the gangrenous condition, practically one-third of the skin and tissue of his penis has been destroyed, and this within the area where plaintiff disclosed to the attending physicians that he had received the blow. Following his discharge from the hospital on January 25, 1941, he had received, and was receiving at the time of the trial below, clinical treatment twice each week. It is also shown that plaintiff will have to undergo several surgical operations during the next two years to repair the damage caused and thus permit him to return to his normal gainful status.
There is no dispute between the parties as to the hazardousness of plaintiff's employment. Neither is it questioned that, at the time of the alleged accident, he was performing work within the scope and course of his employment, as defined by our workmen's compensation statutes, supra, and recognized as such by our courts.
The narrow issue presented is: Was there an accident, and, if so, did the accident bring about the injuries complained of? There are no questions of law involved, the issue being resolved strictly into one of fact.
We are not unmindful of the time-honored rule that the findings of a trial court on questions of fact should not be disturbed unless there appears manifest error. In our appreciation of the facts disclosed, we are convinced that plaintiff sustained an accidental injury within the line of his duties and to which he was exposed by the nature of his employment, and that his present condition was brought about as a consequence of such accident.
Plaintiff's testimony as to the accident, the events leading up to and following it, that he received a blow from the truck crank while cranking the vehicle and that this caused him to collapse, is fully corroborated by the testimony of one Gladys Stewart, who was then sitting on the front porch of her home, near the front of which defendant's truck was stopped, or a distance of approximately fifteen feet away. As a consequence of this accident, plaintiff unquestionably experienced severe pain. The effect of the blow required him to remain at home, in bed, for the five succeeding days, and his condition became so desperate that it was necessary for him to be removed to the Charity Hospital, where he remained for fifty-two consecutive days, requiring constant treatment and the use of heroic measures to avoid death. This evidence is uncontradicted and we find nothing in the record which is suggestive of falsehood or which would lead us to question its credibility. The testimony of plaintiff and that of Gladys Stewart, which fully corroborates him, is direct and positive, and the record fails to present any plausible reason why we should disbelieve or disregard their statements with respect to the occurrence.
Opposed to this uncontroverted testimony is the theory of improbability that such an accident could have happened, which defendant would have us accept. To sustain this theory of improbability of the occurrence and that the injuries received were not a consequence thereof, defendant submitted the testimony of Dr. H.D. Ogden, Jr., a reputable urologist, who examined plaintiff during the month of April, 1941, or approximately five months after the accident. From this examination he found that plaintiff evidenced a post-gangrenous condition with great loss of tissue and skin of the penis and that there was great involvement of the scrotum, all of which had only partially healed. He likewise found that plaintiff was forced to use a tube, inserted through the abdominal wall, for urination purposes, it having been necessary to divert it in this manner due to the inability of plaintiff to obtain relief through the channel provided by nature. *Page 758 
After quoting at length from an eminent authority in urology, Dr. Ogden stated that, though he would not testify that the accident complained of was not the cause of plaintiff's condition, he had very serious doubt that plaintiff sustained an accident in the manner complained of, or that the injuries complained of would result from such a blow. This doubt is entertained by him for the reason, as he states, that the flaccid, pendulous penis — that is, when not erect — is immune to almost all injuries, and that a rupture or lesion to the pendulous portion from a blow or fall is very rare, except when this organ is erect.
The doctor conceded that strictures preventing normal urination can follow external trauma causing injury or rupture of the urinary channel and that, because of the structural peculiarity of the penis and scrotum, inflammation of the urethra, brought on by an external lesion, produces gangrene in the affected parts in seventy per cent. of the cases.
Dr. Sharp, an equally eminent urologist, testified that the condition of plaintiff could have been caused by the accident complained of and he states that, in trauma of the penis or urethra which might cause rupture, urinary extravasation can result, with accompanying infection and gangrene. He further stated that, though he agreed with Dr. Ogden that injuries to a flaccid penis are very rare, they are not impossible, and, in support thereof, cited instances from a text-book published by an eminent authority on the subject matter. He concluded that the infection resulting in gangrene and the consequent stricture and destruction of tissue and skin had its inception locally in the penis and that his examination disclosed that the greater portion of the destruction lies within the area in which plaintiff stated he received the blow. He further concluded that plaintiff is still in a serious condition and will require extensive medical and surgical treatment before he will be able to engage in gainful employment.
It is to be noted that, though one of these eminent specialists concludes that the accident complained of is improbable and that both specialists agree that cases of this kind are rare, Dr. Ogden stated that he wanted it understood that he was not testifying that the accident could not have happened. By this statement, of course, he confirmed Dr. Sharp's testimony that the accident could have happened as alleged. Though we accept as true, in view of the testimony of these specialists, the theory that a flaccid penis is almost immune to all injuries except knife and gun-shot wounds and that, generally, the flaccid organ cannot be injured, we find both doctors conceding that such an accident is not impossible. Furthermore, both ultimately conceded that an injury to the penis as a result of external violence causing inflammation will ordinarily produce the injuries suffered by plaintiff.
Things improbable are defined to be such as are unlikely to be true, or to occur. But it cannot be disputed that abnormal or improbable events often occur. The fact that an occurrence may have all of the earmarks of unusualness or inconsistency does not render it necessarily improbable. Improbabilities are not such as are nature's unchanging and unchangeable laws and the unvarying and invariable principles of mechanics, and so could not be true. Miller v. Hartford Live Stock Ins. Co., 165 La. 777, 116 So. 182.
To accept the theory of improbability, the improbability must be apparent. Here we have the positive testimony of two urologists that the immunity from injury which the flaccid penis enjoys exists only generally and is not true in every instance. They concede that an injury to that organ in a flaccid state can occur, and is not an impossibility. We recognize that conclusions of improbability must and should ordinarily yield to uncontroverted evidence, such as we find in the testimony of plaintiff and corroborated by an eyewitness. Facing the testimony of these witnesses as to what did in fact occur, and with due regard to the decision of the learned district judge, we have reached the opinion that the proof of the accident, with its attending injuries, as claimed, has been clearly established.
Indirect reference is made to the possibility of some other cause, such as syphilis, or other venereal disease, having brought about plaintiff's present condition. It is shown by uncontradicted testimony that plaintiff, prior to the accident in question, never suffered from serious illness and that he has enjoyed excellent health. The hospital records in connection with his treatment show that plaintiff was free from gonorrhea or other venereal disease. Though these records do show that a *Page 759 
laboratory test disclosed that plaintiff was suffering from inherent, or latent, syphilis, both of the medical experts readily conceded that latent or inherent syphilis played no part in and could not have produced the injuries complained of, and both have summarily discarded such a possibility. In any event, it is now well settled in our law that compensation cannot be denied to one suffering from an inherent or dormant disease if such person should sustain an accidental personal injury which causes such dormant disease to become active or virulent and superinduces disability. Behan v. John B. Honor Co., 143 La. 348, 78 So. 589, L.R.A.1918F, 862; Jackson v. Travelers' Insurance Co. et al., 180 La. 43, 156 So. 169; Robichaux v. Realty Operators, Inc., 195 La. 70, 196 So. 23; Bruns v. Bemis Bros. Bag Co., La.App., 8 So.2d 142.
It has been amply established that plaintiff is totally and permanently disabled from engaging in gainful employment, such as he was accustomed to. All of the medical experts concluded, at the time of the trial below, that plaintiff cannot return to work or engage in any form of manual labor. We resolve, therefore, that plaintiff's injury totally and permanently incapacitates him from engaging in any work which his training and experience calls for, or for any work of any reasonable, or similar character, and he is, therefore, entitled to compensation in the amount and for the period claimed.
Should nature or time effect a complete or practically complete recovery, so as to enable plaintiff to resume an occupation of a reasonable character, the law provides a means of modifying the judgment in order to make it comply with the changed conditions.
For the reasons assigned, the judgment appealed from is annulled, avoided and reversed, and it is now ordered that there be judgment herein in favor of plaintiff, Mathew Johnson, and against the defendant, Joseph Tregle, in the full sum of $7.15 per week for a period not to exceed 400 weeks, with legal interest on each installment from its due date until paid, subject to a credit of $30 already received by plaintiff from defendant. Defendant to bear all costs.
Reversed.
JANVIER, J., takes no part.